## THE ADMIRAL DEWEY.
## THE EUREKA NO. 79.

### THE DETROIT.
### No. A–13539.

District Court, E. D. New York.
Nov. 11, 1933.

Macklin, Brown, Lenahan & Speer, of New York City, for libellant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, for claimant.

BYERS, District Judge.

The libellant, owner of the tug Admiral Dewey and the coal barge Eureka No. 79, seeks compensation for damages sustained by them because car floats alongside the tug Detroit, collided with the Dewey and forced the latter into contact with the coal barge.

These incidents occurred on April 13, 1932, in the slip between piers L and M in Jersey City, at a time when the Dewey was entering with a light coal barge in tow.

The slip was about 340 feet wide and, at the place where the contact occurred, this distance was reduced to a little less than 180 feet by reason of the presence at pier M of a tier of three barges, moored abreast, of which the Eureka No. 79 was outside; about opposite the latter and on the northerly side of pier L were two unnamed barges, lying abreast. The latter were each 32 feet in beam, and the first three were 30 feet as to the inside barge and 35 feet as to each of the outside ones.

The Detroit, just prior to the collision, was taking in tow two empty car floats which were lying in the float bridges near the bulkhead at the inshore end of the slip; these she took on her starboard side, abreast, and, as made up, the floats projected substantially in advance of the bow of the Detroit. The total width of the latter tow was 100 feet, and the width of the Dewey tow was about 30 feet, so that, if they were to pass each other in a 180 foot space, the clearance would not exceed 50 feet.

The weather conditions were unimportant, except for a westerly wind of the stipulated strength of 29 miles an hour, blowing out of the slip.

To describe the situation from the standpoint of each of the tugs briefly, it should be stated that the Dewey had come from the East River and, at the time of arrival at the slip, the tide was high water slack, and it was the intention to land the coal barge on the south side of the coal dock which has been called pier M; when the Dewey was about one length in the slip, the Detroit was observed and a one-whistle signal was blown. At that time, the Detroit was at the bridges, in the act of picking up the two floats on the starboard side. No answer was heard to this signal.

The Dewey was proceeding under her slowest speed and then blew one long and two short blasts for instructions from the pier,

and the navigator was told to put the light barge at No. 3 coal chute, which was just inboard of the three barges heretofore described. After receiving this order and when the Dewey was proceeding, another one-whistle signal was blown to the Detroit, and no answer to that was heard.

The Dewey continued in the slip, and then it was realized that the Detroit was coming out without regard to the entering flotilla, at which time the Dewey blew an alarm, her engines were stopped, then reversed, and she lost her way; as a result her stern was brought in contact with the barge that she had in tow.

The Detroit was coming out at an angle, according to the observations made on the Dewey, so that the stern of the former was nearer pier M than pier L, and this was the condition when the inside float struck the Dewey's port bow, and the outside float struck the rail at about the engine-room.

The Dewey blew an alarm at the time when she backed, but her navigator testified that he heard no alarm from the Detroit; under cross-examination, he said that he would not have blown the one-blast whistle to the Detroit unless he had understood that the latter was maneuvering to come out, and his purpose in blowing was to indicate that he intended to enter the slip, which means that he did not intend a port hand passing with both tows in navigation. The place of collision he puts at about 300 feet in from the end of the slip. The mate and the deckhand of the Dewey added little to the master's testimony, and what the engineer says tends to show that, at the time of impact, the engines were in backward motion.

The bargee on the Dewey's tow testified that he heard the first one-blast signal when the barge was about 90 feet from the office of pier M, and that progress was very slow; the testimony of the bargee on the Eureka No. 79 was entirely consistent with the Dewey's version of what took place as above stated.

For the Detroit, it was testified by the navigator of that tug that the Dewey was first seen when the Detroit was ready to move out of the slip and before she got under way; that is, that the Dewey was then 500 feet off the pier ends; at this time, the Detroit was not in shape to come out. He heard a one-whistle signal from the Dewey when the latter was 300 feet off the pier end.

The witness said that the Detroit was half-way out of the slip at that time and practically in the narrow part between the several barges heretofore referred to; that he answered with one whistle, and his engines were just moving, and he understood this exchange to mean a port to port passing, and he denies that there were two one-whistle signals, but admits that the Dewey did blow an alarm just prior to the collision. The Detroit's engines were reversed, which caused the latter to swing toward pier M, and he denied that there was any injury to either the tug Dewey or the car floats in his tow. Under cross-examination, he first said that he expected the Dewey to wait outside to enable the witness to get his tow out of the slip, which he changed to the effect that the Dewey should have come in slow enough to allow the witness to accomplish his own purpose.

It is clear that he expected the Dewey so to maneuver as not to interfere with the Detroit and her car floats in emerging from the slip.

The mate on the Detroit, after testifying to his activities in the make-up of his tow and the position that he occupied at the time of the collision, testified that the Dewey's port bow hit the port corner of the inside float, and then that the Dewey lunged for pier M and the coal boat being towed by the latter pushed the Dewey up the slip and also toward the Eureka No. 79; under cross-examination, he stated that the Detroit started out of the slip after the exchange of one-blast signals. The deckhand of the Detroit and the floatman of the barges added nothing to the testimony already referred to.

It is conceded by both sides that the question of fault is one purely of fact.

A consideration of the testimony leads to the belief that, even under the evidence produced for the Detroit, it is apparent that the latter knew that the Dewey was coming in the slip and had the right to do so, at a time when the Detroit could have held back near the transfer bridges, without inconvenience, so that the entrance of the Dewey might be accomplished without peril. The navigator of the Detroit elected not to do this but to proceed, on the theory, apparently, that he had a paramount right to enter the narrow space between the two tiers of barges that were opposite each other as heretofore stated, and that the Dewey and her tow were obliged to defer to him. He assumed whatever risk was involved in making this decision, and, as he was unable to accomplish his purpose, the Detroit must be held liable for whatever injury was occasioned to the Dewey and the Eureka No. 79.

The libellant therefore may take a decree with costs, to be settled on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.